# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58109-4-II |
| Respondent, | |
| v. | |
| DAKOTA NORMAN McKINLEY, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Dakota N. McKinley appeals his first degree child molestation and second degree rape convictions. McKinley argues that the trial court erred by giving the jury a no corroboration instruction and by admitting fact of the complaint evidence. McKinley also argues, and the State concedes, that the crime victim penalty assessment (CVPA) and DNA collection fee should be stricken from his judgment and sentence. McKinley raises an additional claim of prosecutorial misconduct in a statement of additional grounds for review (SAG).[1]

We hold that we are bound by the Washington Supreme Court's approval of the no corroboration instruction in *State v. Clayton*, 32 Wn.2d 571, 202 P.2d 922 (1949); thus, the trial court did not err in giving a no corroboration instruction. We also hold that while the trial court erred by admitting fact of the complaint evidence from the victim's parents, the error was harmless. Further, we reverse the challenged legal financial obligations (LFOs). Finally, we reject

---

[1] RAP 10.10.

No. 58109-4-II

McKinley's SAG claim because he has not established the prosecutor's comments were improper. Accordingly, we affirm McKinley's convictions, but we remand for the trial court to strike the CVPA and DNA collection fee from his judgment and sentence.

FACTS

In November 2018, E.M.D.[2] and her father contacted law enforcement, alleging McKinley sexually abused E.M.D. In February 2022, the State charged McKinley by amended information with first degree rape of a child, first degree child molestation, and second degree rape. The case proceeded to a jury trial in February 2023.

A. MOTIONS IN LIMINE

Prior to trial, McKinley moved under ER 404(b) to exclude evidence regarding similar charges in Oregon, for which McKinley was acquitted. The trial court granted McKinley's motion.

McKinley also moved to exclude testimony that E.M.D. disclosed McKinley's abuse to her brother and parents, arguing the disclosures were not timely enough to come in under the fact of the complaint doctrine. The State argued that the disclosure testimony was necessary to "fight . . . misconceptions . . . that jurors may have with respect to victims of child sexual assault," "boost [E.M.D.'s] credibility," and make up for the lack of eye-witness and physical evidence. Verbatim Rep. of Proc. (VRP) (Feb. 13, 2023) at 20. The trial court denied McKinley's motion, ruling that the State could present fact of the complaint evidence pursuant to *State v. Ortiz Martinez*.[3]

---

[2] We use initials to protect the victim's identity and privacy interests. *See* General Order 2023-2 of Division II, *Using Victim Initials* (Wash. Ct. App.), available at: https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2023-2&div=II.

[3] 196 Wn.2d 605, 476 P.3d 189 (2020).

2

B.    TRIAL TESTIMONY

At trial, the State called several witnesses, including E.M.D.'s brother and parents, E.M.D.'s therapist, and other professionals who participated in the investigation.

1.    Testimony Regarding Sexual Abuse

E.M.D. testified that when she was around 8 years old, she and her mother celebrated the Christmas holiday with Courtney, a friend of E.M.D.'s mother. The celebration took place in December 2015 or 2016, and was hosted by Courtney's mother. Also present were Courtney's two young children, McKinley (Courtney's brother), McKinley's mother, and McKinley's mother's boyfriend. This celebration was the first time E.M.D. met McKinley.

E.M.D. also testified that after she and Courtney's children fell asleep for the night, she woke to find McKinley standing over her. When E.M.D. woke up, E.M.D.'s leggings and underwear had been pulled down below her knees. McKinley was touching E.M.D. inside her vagina. After E.M.D. woke up, McKinley left the room, and E.M.D. zipped herself into a sleeping bag. According to E.M.D., McKinley returned multiple times that night, and attempted, unsuccessfully, to unzip E.M.D.'s sleeping bag.

McKinley testified and admitted he knew E.M.D. but denied ever having sexual contact with her. McKinley did not remember E.M.D. coming to his mother's house for a Christmas party in 2015 and testified that it was "[a]bsolutely not" possible that E.M.D. attended and McKinley forgot. VRP (Feb. 15, 2023) at 475.

2. Disclosure Testimony

E.M.D. testified that she told her older brother about the abuse soon after the abuse happened.  E.M.D.'s brother testified that E.M.D. told him she had been "touched . . . inappropriately."  VRP (Feb. 14, 2023) at 253.

E.M.D. also testified that the next person she told about the abuse was her mother.  E.M.D.'s mother testified that E.M.D. disclosed someone had touched her inappropriately.  E.M.D. made the disclosure 2-3 years after the abuse.

E.M.D. further testified that her father found out about the abuse around 3 years after the abuse happened and that when he asked her about it, she confirmed something had happened.  E.M.D.'s father testified that he found out about the abuse through a friend of E.M.D.'s mother.  After he found out about the abuse, E.M.D.'s father asked E.M.D. about it, and E.M.D. told him "somebody had sexually assaulted her."  VRP (Feb. 14, 2023) at 271.  Following E.M.D.'s disclosure, they reported the abuse to the police.

E.M.D. also disclosed the abuse to a nurse practitioner and a child forensic interviewer, both of whom assessed E.M.D. following her police report.  The nurse practitioner testified that E.M.D. stated that McKinley touched her vagina, and the forensic interviewer testified that E.M.D. "made statements of being touched" during the interview.  VRP (Feb. 14, 2023) at 363.

3. Additional Corroborative Testimony

E.M.D.'s brother testified that after E.M.D. disclosed the sexual abuse to him, he noticed "she wasn't the same as she used to be," acting less playfully than she used to and spending more time in her room.  VRP (Feb. 14, 2023) at 255.  E.M.D.'s brother also testified that E.M.D. could

4

not be in her room without locking the door, and that if he opened the door while she was asleep, she would "jolt up . . . and . . . be a little scared." VRP (Feb. 14, 2023) at 257.

E.M.D.'s father similarly testified that after the abuse, E.M.D. began responding poorly to stressful situations: she would "almost hyperventilate" and "cry inconsolably." VRP (Feb. 14, 2023) at 318. E.M.D.'s father also testified that E.M.D. "locks her door all times of the day" and that when he has "to wake [E.M.D.] up sometimes," he has "to be very careful because she wakes up terrified." VRP (Feb. 14, 2023) at 318, 319.

E.M.D.'s mother also testified about E.M.D.'s behavioral changes. For example, after the sexual abuse, McKinley "paid a lot of attention to" E.M.D. and E.M.D. acted uncomfortable around McKinley and would scoot away from him if he sat down next to her. VRP (Feb. 15, 2023) at 393. Also, before the sexual abuse, E.M.D. was "[b]ubbly. Fun. Smart. Loving. Cute," whereas after the sexual abuse, E.M.D. became "really sensitive" and distanced herself from her mother. VRP (Feb. 15, 2023) at 395.

E.M.D.'s therapist, Diana Latorre, testified that one of the reasons she began seeing E.M.D. was an "allegation of sexual abuse by an older man." VRP (Feb. 15, 2023) at 457. E.M.D. reported having nightmares, intrusive memories, flashback experiences, anxiety, panic attacks, feeling sad, and avoidance. Latorre could not recall if E.M.D. "link[ed] any of these symptoms or issues to any of" the individual stressors E.M.D. reported, but the alleged abuse was one of the stressors E.M.D. reported. VRP (Feb. 15, 2023) at 458. Latorre diagnosed E.M.D. with post-traumatic stress disorder (PTSD).

C.      JURY INSTRUCTIONS

At trial, the State proposed a no corroboration jury instruction. McKinley objected, arguing that while the instruction was "an accurate statement of law," it also "constitutes a comment on the evidence." VRP (Feb. 15, 2023) at 430. The trial court ruled it would give the instruction because it correctly stated the law and was not a comment on the evidence pursuant to case law.

The trial court gave the following no corroboration instruction:

> In order to convict a person of the crime of Rape of a Child in the First Degree, Child Molestation in the First Degree, or Rape in the Second Degree as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated.

Clerk's Papers (CP) at 35. The trial court also instructed the jurors that they were "the sole judges of the credibility of each witness" and "the value or weight to be given to the testimony of each witness." CP at 18. Also, each to-convict instruction included the following language: "If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 25, 27, 29.

D.      CLOSING ARGUMENTS AND VERDICT

During closing arguments, the State argued that the question at "the center of this case is . . . Did [McKinley] come into [E.M.D.'s] room, pull her leggings and underwear down? And did he touch her or penetrate her?" VRP (Feb. 15, 2023) at 496. The State then argued that "the foundation of our evidence rests on E.M.D.'s testimony," explaining that the jurors were the "sole judges" of E.M.D.'s credibility. 2 VRP (Feb. 15, 2023) at 506-07, 508.

The State went on to argue that while E.M.D.'s testimony was the foundation of its case, the State had also presented evidence corroborating E.M.D.'s allegations: testimony regarding

E.M.D.'s behavioral changes after the abuse, E.M.D.'s need to lock the door anytime she was in a bedroom, and E.M.D.'s PTSD diagnosis. The State also repeatedly stressed the disclosure evidence as corroborative of E.M.D.'s allegations, arguing, for example, "[I]t's not just [E.M.D.] telling you that this happened. It's her father, her brother, and her mother saying: Yeah, she told us. She told us this happened." 2 VRP (Feb. 15, 2023) at 510-11.

During his closing arguments, McKinley argued, "[T]here is not a lot of direct evidence. The direct evidence you have is a testimony of E.M.D. and the testimony of [McKinley]." 2 VRP (Feb. 15, 2023) at 515. McKinley stressed that no other witnesses "saw anything or heard anything," and that while "the law says you don't require corroboration," a lack of corroboration "can factor into your decision of credibility and weighing the evidence." 2 VRP (Feb. 15, 2023) at 515, 518.

During the State's rebuttal argument, the following exchange occurred relevant to McKinley's SAG claim:

> [STATE]: [Defense counsel] and I agree on one thing, these are hard cases. They happen behind closed doors. They happen in the middle of the night. There aren't usually witnesses because these things don't happen when other people can see them happen.
> [DEFENSE COUNSEL]: Objection, Your Honor. Counsel is testifying to other cases that he may or may not have been a part of.
> THE COURT: All right. Stick to true rebuttal, please.
> [STATE]: Okay. These are difficult cases. This case happened in the middle of the night. Happened when everyone was asleep, including the victim. And it happened to a child.

2 VRP (Feb. 15, 2023) at 518-19. The State then repeated its earlier argument that without physical evidence, "It's about [E.M.D.'s] word and all of the things that confirm what she's telling you,"

7

including the disclosures she made to her family and those who investigated E.M.D.'s allegations. 2 VRP (Feb. 15, 2023) at 519.

Following closing arguments, the jury found McKinley guilty as charged.

D.    SENTENCING

The trial court sentenced McKinley to an indeterminate sentence of 300 months to life. The trial court found McKinley indigent because he "receives an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level" and waived all nonmandatory LFOs.  CP at 62.  The trial court also imposed the $500 CVPA and a $100 DNA collection fee.

McKinley appeals.

ANALYSIS

A.    NO CORROBORATION JURY INSTRUCTION

McKinley argues that the trial court erred by giving a no corroboration jury instruction. We disagree.

1.    No Corroboration Instruction: Comment on the Evidence

McKinley argues that the no corroboration instruction was an improper comment on the evidence because it suggested that E.M.D. was particularly credible, misled the jury about its role, and did not tell the jury it could believe McKinley's testimony without corroboration.  We are bound by our Supreme Court's opinion in *Clayton*, holding that a no corroboration instruction is not an improper comment on the evidence, and therefore, we reject McKinley's argument.

> a. Legal principles

The Washington constitution prohibits judges from commenting on the evidence. WASH. CONST. art. IV, § 16. "A trial court makes an improper comment on the evidence if it gives a jury instruction that conveys to the jury his or her personal attitude on the merits of the case." *State v. Rohleder*, ___ Wn. App. 2d ___, 550 P.3d 1042, 1045 (2024) (published in part), *pet. for review*, 103265-0 (Jul. 17, 2024); *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Jury instructions that correctly state the law are not comments on the evidence. *Rohleder*, 550 P.3d at 1045; *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015). We review alleged instructional errors de novo. *Rohleder*, 550 P.3d at 1045; *Levy*, 156 Wn2d at 721.

Here, the no corroboration instruction for a sex offense is based on RCW 9A.44.020(1), which states that "[i]n order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated." Our Supreme Court upheld the no corroboration instruction in *Clayton*, and the no corroboration instruction has been repeatedly upheld as a correct statement of the law. *E.g.*, *State v. Zwald*, No. 84950-6-I, slip op. at 10 (Wash. Ct. App. Aug. 26, 2024);[4] *Rohleder*, 550 P.3d at 1047; *State v. Chenoweth*, 188 Wn. App. 521, 537, 354 P.3d 13, *review denied*, 184 Wn.2d 1023 (2015); *State v. Johnson*, 152 Wn. App. 924, 936, 219 P.3d 958 (2009); *State v. Zimmerman*, 130 Wn. App. 170, 182, 121 P.3d 1216 (2005), *adhered to on remand*, 135 Wn. App. 970, 146 P.3d 1224 (2006).[5]

---

[4] https://www.courts.wa.gov/opinions/pdf/849506%20orderandopinion.pdf.

[5] However, in upholding the no corroboration instruction, the Court of Appeals has expressed misgivings about its use. For example, in *Chenoweth*, the concurring judge wrote, "If the use of the noncorroboration instruction were a matter of first impression, I would hold it is a comment on the evidence and reverse the conviction." 188 Wn. App. at 538 (Becker, J., concurring). And

b.      Suggesting that E.M.D. was particularly credible

McKinley argues that the no corroboration instruction was a comment on the evidence because, by singling out E.M.D.'s testimony, it suggested that E.M.D. was particularly credible. This argument fails.

In *Clayton*, the trial court instructed the jury as follows:

"You are instructed that it is the law of this State that a person charged with attempting to carnally know a female child under the age of eighteen years may be convicted upon the uncorroborated testimony of the prosecutrix alone. That is, the question is distinctly one for the jury, and if you believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant, you will return a verdict of guilty, notwithstanding that there be no direct corroboration of her testimony as to the commission of the act."

32 Wn.2d at 572. The defendant argued that by singling out the victim "from all the other witnesses," the instruction "tells the jury that the weight of her testimony is such that a conviction can be based upon it alone" and was therefore error. *Id.* at 573.

Our Supreme Court rejected this argument.

[W]hat the court . . . told the jury was not that the uncorroborated testimony of the prosecutrix in the instant case was sufficient to convict the appellant of the crime with which he was charged, but, rather, that in cases of this particular character [sex offenses], a defendant *may be* convicted upon such testimony alone, provided the jury should believe from the evidence, and should be satisfied beyond a reasonable doubt, that the defendant was guilty of the crime charged. That was a correct statement of law.

*Id.* at 574 (emphasis in original).

---

in *Rohleder*, the court wrote, "Like our colleagues in . . . earlier cases . . . we have strong concerns about the giving of the no corroboration instruction. We emphasize that there is no need for a no corroboration instruction, and the better practice is for trial courts not to give one." 550 P.3d at 1047. Both the *Rohleder* opinion and *Chenoweth* concurrence felt bound by *Clayton*'s holding. *Rohleder*, 550 P.3d at 1047; *Chenoweth*, 188 Wn. App. at 538.

Like the defendant in *Clayton*, McKinley argues that the no corroboration instruction suggests E.M.D. was credible by singling out E.M.D.'s testimony. We are bound by the *Clayton* court's rejection of the same argument. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (once our Supreme Court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled). Thus, McKinley's argument fails.

        c.      Absence of additional language

McKinley argues that the no corroboration instruction in his case is distinguishable from the instruction in *Clayton* because McKinley's instruction lacked language reinforcing the jury's role. We are not persuaded by McKinley's argument.

In *Clayton*, the jury was instructed that a conviction may rest on uncorroborated testimony and that "'the question is distinctly one for the jury, and if you believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant, you will return a verdict of guilty.'" 32 Wn.2d at 572. We have rejected at least twice the argument that the no corroboration instruction must include the clarifying language found in *Clayton*. *See Rohleder*, 550 P.3d at 1047 (concluding that a no corroboration instruction nearly identical to the one at issue here could not be distinguished for lack of "additional language similar to the language in the *Clayton* instruction"); *Johnson*, 152 Wn. App. at 936 ("We see no clear pronouncement from our Supreme Court on whether the additional language is necessary to prevent an impermissible comment on the evidence under article IV, section 16, and we hold that the trial court's corroboration instruction was not an erroneous statement of the law.").

Furthermore, here, the clarifying language was included in the trial court's other instructions to the jury. For example, instruction 1 read, "You are the sole judges of the credibility

of each witness. You are also the sold judges of the value or weight to be given to the testimony of each witness." CP at 18. Also, each to-convict instruction included the following language: "If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 25, 27, 29. Thus, McKinley's attempt to distinguish *Clayton* fails.

            d.      Lack of corresponding instruction regarding the defendant

McKinley further argues the trial court erred by giving the no corroboration instruction because the instruction suggested that the jury could believe only E.M.D.'s uncorroborated testimony and not McKinley's. Again, based on *Clayton*, this argument fails.

The same argument was made by the defendant in *Rohleder*, and the court rejected the argument based on *Clayton*. *See Rohleder*, 550 P.3d at 1047. We concur with *Rohleder* that we are bound by *Clayton* and hold that the trial court did not improperly comment on the evidence by giving a no corroboration instruction.

            2.      Violation of the Right to a Jury Trial

McKinley argues that the no corroboration instruction violated his right to a jury trial under article I, section 21 of the Washington Constitution because it "foreclose[s] a factual basis on which the jury could find the evidence insufficient." Br. of Appellant at 31. We rejected an identical argument in *Rohleder*, and we do so again.

In *Rohleder*, the trial court instructed the jury that:

"In order to convict a person of the crimes of Rape of a Child in the First Degree, or Child Molestation in the First Degree, or Child Molestation in the Second Degree as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated."

12

550 P.3d at 1045 (quoting Record). On appeal, the defendant argued "that the no corroboration instruction violated the right to a jury trial because it suggested that jurors were *required* to believe [the victim] without corroboration." *Id*. at 1048 (emphasis in original). This court rejected that argument because the instruction's language allowed, but did not require, jurors to believe the victim's uncorroborated testimony, and other jury instructions reinforced the jury's role. *Id*. Accordingly, the *Rohleder* court held that the no corroboration instruction did not violate the defendant's right to a jury trial. *Id*.

Other than the enumerated crimes, the no corroboration instruction here is nearly identical to the one in *Rohleder*. *Compare* CP at 35 *with Rohleder*, 550 P.3d at 1045. Thus, like the instruction in *Rohleder*, the no corroboration instruction here told the jury that it could believe E.M.D.'s uncorroborated testimony, but was not required to. And like in *Rohleder*, other instructions informed the jurors that they were the sole arbiters of witness credibility and that it would be their duty to convict McKinley only if the State proved each element of the charged crimes beyond a reasonable doubt. Accordingly, the trial court did not violate McKinley's right to a jury trial by giving a no corroboration instruction.

B.     FACT OF THE COMPLAINT EVIDENCE

McKinley argues that the trial court erred by allowing E.M.D.'s parents to testify about E.M.D.'s disclosures of abuse. McKinley appears to concede that disclosure testimony from E.M.D.'s brother was admissible. *See* Br. of Appellant at 44-45 ("While the defense did not object to evidence E.M.D. made an allegation of abuse to her brother closer in time to the events at issue, it was an abuse of discretion to admit evidence of the subsequent and untimely claims of abuse made to her mother and father.").

13

The State concedes that the challenged disclosures were too far removed from the alleged abuse to come in under the fact of the complaint doctrine, but the State argues the disclosures were admissible to explain how law enforcement initiated their investigation into E.M.D.'s allegations. We accept the State's concession, but we reject the State's alternative argument and hold that the error was harmless.

    1.      E.M.D.'s Parents' Testimony Regarding Disclosures

The fact of the complaint doctrine is a case law exception to the prohibition on hearsay and allows for the admission of evidence that a victim timely complained about alleged abuse. *State v. DeBolt*, 61 Wn. App. 58, 63, 808 P.2d 794 (1991). Under the fact of the complaint doctrine, "the State may present evidence that the victim reported the sexual violence to someone as part of its case in chief." *Ortiz Martinez*, 196 Wn.2d at 611. However, the fact of the complaint evidence is admissible "only to demonstrate that the victim reported to someone" and witnesses may not disclose "details such as identity of the perpetrator." *Id*. The doctrine "plays an important function because many jurors still subscribe to the myth that 'real' victims report promptly." *Id*.

Disclosures must be "'timely made'" to come in under the doctrine. *Id*. at 614 (quoting *State v. Ferguson*, 100 Wn.2d 131, 136, 667 P.2d 68 (1983), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022)). A disclosure is timely "when there is an 'opportunity to complain.'" *Id*. (internal quotation marks omitted) (quoting *State v. Griffin*, 43 Wash. 591, 597, 86 P. 951 (1906)). Whether to admit fact of the complaint evidence is left to the trial court's discretion, and we review the admission of fact of the complaint evidence for an abuse of discretion. *Id*. at 614-15.

Here, McKinley and the State are correct that E.M.D.'s disclosures to her parents came too late to be admitted under the fact of the complaint doctrine because they came 2-3 years after the alleged abuse. *See Chenoweth*, 188 Wn. App. at 533 (holding that "disclosures made nearly a year later cannot reasonably be considered 'timely'"). However, the State responds that disclosure evidence from E.M.D.'s parents was "admissible to show how the allegations came to the attention of law enforcement." Br. of Resp't at 8.

Division One addressed a similar argument in *Chenoweth*. In *Chenoweth*, the defendant challenged the admission of testimony that the victim disclosed sexual abuse to his mother, sister, and law enforcement a year after he was abused. 188 Wn. App. at 531. Before the trial court, the State argued the disclosures were admissible under the fact of the complaint doctrine, while the defendant argued the disclosures were untimely and thus inadmissible. *Id*. The trial court ruled the disclosure evidence was admissible "to explain how the allegations came to the attention of law enforcement" despite the untimeliness of the disclosures. *Id*.

On appeal, the court concluded that the challenged disclosures were not timely enough to come in under the fact of the complaint doctrine. *Id*. at 532. However, the court explained that "'[w]hen a statement is not offered for the truth of the matter asserted but is offered to show why an officer conducted an investigation, it is not hearsay and is admissible.'" *Id*. at 533 (quoting *State v. Iverson*, 126 Wn. App. 329, 337, 108 P.3d 799 (2005)). Because "the trial court admitted the evidence to show only how the allegations came to the attention of law enforcement" and not for its truth, the *Chenoweth* court held that the trial court did not abuse its discretion. *Id*. at 533, 535.

15

Unlike in *Chenoweth*, the trial court here allowed E.M.D.'s parents' testimony relating to the delayed disclosures under the fact of the complaint doctrine; the trial court did not admit the disclosure evidence to contextualize the subsequent investigation by law enforcement. *See* VRP (Feb. 13, 2023) at 46 (admitting "the complaint itself" under the fact of the complaint doctrine but prohibiting testimony regarding "specific[] . . . acts or identity of the offender"). Moreover, the State's pretrial and closing arguments demonstrate that the State offered the disclosure evidence for the truth of the matter asserted—that E.M.D. was sexually abused. For example, the State argued during motions in limine that the disclosure evidence was admissible under the fact of the complaint doctrine, not to explain how the police initiated their investigation. The State also argued that the disclosure evidence was necessary to "fight . . . misconceptions . . . that jurors may have with respect to victims of child sexual assault," "boost the credibility of the complaining witness," and make up for the lack of eye-witnesses and physical evidence. VRP (Feb. 13, 2023) at 20. And during closing arguments, the State argued that E.M.D.'s disclosures corroborated her allegations. *See* 2 VRP (Feb. 15, 2023) at 510-11 ("[I]t's not just [E.M.D.] telling you that this happened. It's her father, her brother, and her mother saying: Yeah, she told us. She told us this happened.").

Because the State's pretrial and closing arguments show that the evidence was offered for its truth, *Chenoweth* is distinguishable. E.M.D.'s disclosures to her parents years after the sexual abuse occurred were not timely under the fact of the complaint doctrine. Therefore, the trial court abused its discretion by admitting the challenged evidence under the fact of the complaint doctrine.

16

2.      Error Was Harmless

The State argues that even if the trial court erred by admitting the disclosure evidence, the error was harmless. We agree.

Evidentiary errors are reviewed under the nonconstitutional harmless error standard. *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). Under that standard, we will not reverse the trial court unless the defendant shows that, absent the error, there is a reasonable probability that "'the outcome of the trial would have been materially affected.'" *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012) (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

McKinley argues that allowing E.M.D.'s parents to provide additional disclosure testimony was not harmless because the State's case rested entirely on E.M.D.'s credibility, citing the dissent in *Ortiz Martinez*.

In *Ortiz Martinez*, our Supreme Court rejected the defendant's argument that the trial court erred by admitting untimely disclosures under the fact of the complaint doctrine and affirmed the defendant's convictions. 196 Wn.2d at 615-16. Justice Gordon McCloud dissented, explaining that she would have reversed the defendant's convictions. *Id.* at 629 (Gordon McCloud, J., dissenting). Applying the nonconstitutional harmless error standard, Justice Gordon McCloud explained that the admission of "four hearsay complaints" likely affected the trial's outcome because "[t]he State's entire case revolved around the credibility of [the victim's] testimony" and the State used the disclosure testimony "as substantive evidence to bolster [the victim's] credibility." *Id.* Furthermore, case law established that "'[r]epetition generally is not a valid test

of veracity.'" *Id.* (alteration in original) (quoting *State v. Purdom*, 106 Wn.2d 745, 750, 725 P.2d 622 (1986)).

McKinley's argument fails because there was other evidence presented to the jury such that there is no reasonable probability that the outcome of the trial was materially affected by the erroneous admission of the parents' disclosure testimony. For example, E.M.D.'s brother, the nurse practitioner, and the child forensic interviewer testified that E.M.D. disclosed the sexual abuse to them. E.M.D.'s brother also testified that E.M.D. was less playful in the years following the abuse and that E.M.D. could not be in her room without locking the door. E.M.D.'s mother offered similar testimony, explaining that E.M.D. acted uncomfortable around McKinley following the abuse, and that E.M.D. was more sensitive and withdrawn. And E.M.D.'s father testified that E.M.D. responded poorly to stress after the abuse, always kept her door locked, and would "wake[] up terrified." VRP (Feb. 14, 2023) at 319. The jury also heard from E.M.D.'s therapist, who testified about E.M.D.'s symptoms and that she diagnosed E.M.D. with PTSD after E.M.D. reported "sexual abuse by an older man." VRP (Feb. 15, 2023) at 457. Accordingly, McKinley fails to show that but for the disclosure testimony from E.M.D.'s parents, there is a reasonable probability that the outcome of the trial could have been materially affected. Thus, the trial court's error was harmless.

C.    THE CVPA AND DNA COLLECTION FEE

McKinley argues, and the State concedes, that the CVPA and DNA collection fee should be stricken from McKinley's judgment and sentence. We accept the State's concession.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the CVPA on indigent defendants. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048, *pet. for review filed*,

102378-2 (Sept. 14, 2023). Although this amendment took effect after McKinley's sentencing, it applies to cases pending on appeal. *Id*.

To strike the CVPA, the trial court must have found McKinley indigent under the applicable statutory standard. The CVPA is no longer authorized for defendants who are indigent as defined in RCW 10.01.160(3). RCW 7.68.035(4). For purposes of RCW 10.01.160(3), a defendant is indigent if they meet the criteria in RCW 10.101.010(3)(a)-(c). A person is indigent under RCW 10.101.010(3)(c) if they "[r]eceiv[e] an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level."

Here, the trial court determined that McKinley was indigent because he "receives an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level." CP at 62. Thus, the CVPA is no longer authorized for McKinley.

Also, effective July 1, 2023, the DNA collection fee is no longer statutorily authorized. RCW 43.43.7541; LAWS OF 2023, ch. 449, § 4. Because McKinley's case is on appeal, the amendments to RCW 43.43.7541 apply. *Ellis*, 27 Wn. App. 2d at 17. Therefore, imposition of the DNA collection fee is no longer authorized.

Because neither challenged fee is currently statutorily authorized, and McKinley is indigent, we remand with instructions to strike the CVPA and DNA collection fee from McKinley's judgment and sentence.

D.     STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In his SAG, McKinley claims the State committed prosecutorial misconduct during closing argument by referencing "an Oregon trial case against [him] in front of the jury," violating the trial court's pretrial order excluding such evidence. (SAG) at 1.

RAP 10.10(a) allows criminal defendants to "file a pro se statement of additional grounds for review to identify and discuss those matters related to the decision under review." While defendants are not required to reference the record or cite legal authorities, this "court will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c); *see also State v. Bluehorse*, 159 Wn. App. 410, 436, 248 P.3d 537 (2011).

To prevail on a claim of prosecutorial misconduct, the defendant must show that "'the prosecutor's conduct was both improper and prejudicial.'" *State v. Restvedt*, 26 Wn. App. 2d 102, 126, 527 P.3d 171 (2023) (quoting *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012)). If the defendant objected to the alleged improper conduct at trial, then on appeal, the defendant "must show that the prosecutor's misconduct 'resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.'" *Id.* (quoting *Emery*, 174 Wn.2d at 760).

McKinley claims that during closing argument, the prosecutor stated, "'This happened multiple times,'" at which point defense counsel objected, "'He's talking about a different case.'" SAG at 2. We note that McKinley's quote cannot be found in the record before us nor is there any reference to an Oregon case during closing arguments. The only argument in the record where another case may have been referenced is the opening paragraph of the State's rebuttal arguments. The State argued:

> [STATE]: [Defense counsel] and I agree on one thing, these are hard cases. They happen behind closed doors. They happen in the middle of the night. There aren't usually witnesses because these things don't happen when other people can see them happen.
> [DEFENSE COUNSEL]: Objection, Your Honor. Counsel is testifying to other cases that he may or may not have been a part of.
> THE COURT: All right. Stick to true rebuttal, please.

[STATE]: Okay. These are difficult cases. This case happened in the middle of the night. Happened when everyone was asleep, including the victim. And it happened to a child.

2 VRP (Feb. 15, 2023) at 518-19.

Given the State's argument, McKinley fails to carry his burden of showing that the prosecutor's statements were improper—the prosecutor referenced child sex abuse cases generally in an attempt to explain the lack of physical or direct evidence in the State's case. At no point did the prosecutor reference the Oregon case or reveal information that would alert the jury to the existence of the Oregon case. Moreover, defense counsel objected and the objection appears to have been sustained. Thus, McKinley's claim fails.

## CONCLUSION

We affirm McKinley's convictions, but we remand to the trial court with instructions to strike the CVPA and DNA collection fee from his judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Price, J.